UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------
RAJIV JAIN,

                Plaintiff,

          -against-

TOKIO MARINE MANAGEMENT INC.,

                Defendant.
------------------------------------------------

16cv8104

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Tokio Marine Management Inc. ("Tokio Marine") moves for summary judgment in this Title VII and New York City Human Rights Law ("NYCHRL") action. For the following reasons, Tokio Marine's motion is granted in part and denied in part.

## BACKGROUND

        In 2013, Tokio Marine, a commercial property and casualty insurer, hired Jain as a Senior Underwriter in its New York office. (Pl.'s Counterstatement Pursuant to Local Rule 56.1, ECF No. 51 ("Pl.'s 56.1") ¶¶ 1–2.) Tokio Marine terminated him in November 2014. (Pl.'s 56.1 ¶ 27.)

        Tokio Marine's New York unit consisted of six people including Jain, who was the only person of Indian descent. (Pl.'s 56.1 ¶ 5.) The unit was a diverse group that included two white males, a white female, an Asian female, an African-American female, and Jain. (Pl.'s 56.1 ¶ 5.) Three of the five other employees were "Underwriters," one was a technical assistant, and one was Jain's supervisor. (Pl.'s 56.1 ¶ 5.) In June 2014, Jain's supervisor—who was the Senior Vice President and Head of Property ("HOP")—stepped down. (Pl.'s 56.1 ¶ 6.) In his stead, Tokio Marine assigned Jason Taylor, a white male and the HOP in London, as interim

HOP for New York. (Pl.'s 56.1 at ¶ 6.) Tokio Marine also tasked Taylor with identifying a replacement HOP. (Pl.'s 56.1 ¶ 6.)

According to Jain, his treatment at Tokio Marine changed after Taylor's interim appointment. Specifically, Jain maintains that he received favorable reviews prior to Taylor's appointment. While the parties dispute whether his reviews were indeed "favorable," Jain's 2013 performance evaluation—issued in March 2014—gave him an overall performance rating of 4.12 out of 6.0. (Aff. of Rajiv Jain, ECF No. 54 ("Jain Aff.") Ex. 1 at D0000228.) A rating of 4 means that an employee "[m]eets [a]ll [e]xpectations," while a rating of 5 means that an employee "[m]eets [a]ll [e]xpectations and [e]xceeds [s]ome." (Jain Aff. Ex. 1 at D0000228.)

Taylor "experienced difficulties with [Jain]'s work performance and found it necessary to send emails to [Jain] advising of 'errors.'" (Pl.'s 56.1 ¶ 12.) Although the parties dispute whether Jain failed to complete certain Underwriting Information Sheets ("UIS") and respond to Taylor's emails, the parties agree that Taylor reported these performance issues to Satoshi Naganuma, the Global HOP, as well as to human resources. (Pl.'s 56.1 ¶ 14; Compl., ECF No. 1 ¶ 30.) Jain believed Taylor's emails to him constituted "harassment." (Pl.'s 56.1 ¶ 15.) But Taylor sent similar emails to another Underwriter—who was a white male— complaining about the same UIS issues. (Pl.'s 56.1 ¶ 16.) The parties dispute the severity of that employee's UIS mistakes and whether Taylor addressed that employee in the same way and at the same time as Jain. (Pl.'s 56.1 ¶ 16.)

In August and September 2014, Jain complained to human resources about alleged harassment. (Pl.'s 56.1 ¶¶ 21; Jain Aff. ¶¶ 66, 69.) The harassment complained of included "confusing emails" sent by Taylor and Taylor's purported failure to inform Jain that he was coming to New York. (Pl.'s 56.1 ¶ 21.) Jain contends that he also complained to human

2

resources that he was "singled out" and "left out of meetings." (Jain Aff. ¶ 67.) While it is unclear whether he told human resources about any other issues, Jain raised a number of different complaints in this litigation, including that Taylor "deliberately stall[ed] his peer review approval" of Jain's submissions. (Jain Aff. ¶ 42.) But in spite of his issues with Taylor, Jain avers that Taylor told him that he was "on target to meet his individual and team goals for 2014" during his mid-year review in September 2014. (Jain Aff. ¶ 29.)

In late-October 2014, Naganuma commented in an e-mail about "operating as one team," to which Jain responded that he did not "need to be reminded of the team approach," and that he was being "unfairly targeted." (Pl.'s 56.1 ¶ 17.) The next day, Naganuma responded that he was "perplexed about [Jain's] comment" and asked him to elaborate. (Pl.'s 56.1 ¶ 19.) The parties dispute whether Jain followed up with Naganuma.

With respect to his complaints to human resources and Naganuma, Jain concedes that "he never mentioned or used the word 'discrimination'" and "never mentioned that he was being treated differently because of his national origin or race." (Pl.'s 56.1 ¶¶ 18, 20; Jain Aff. ¶ 67.) He further concedes that he "did not contact Tokio Marine's 1-800 number to report Taylor and [he] did not directly accuse [Taylor] of discrimination." (Jain Aff. ¶ 65.) Rather, Jain contends that racial animus was implied because human resources employees "knew [his] race and national origin," (Pl.'s 56.1 ¶ 20), and "the race and color of [his] peers," (Jain Aff. ¶ 67).

In late-October 2014, Jain applied for the open New York HOP position. (Pl.'s 56.1 ¶ 22.) The job description called for "[p]referably 5 to 10 years of underwriting experience in property insurance," "[p]referably 5 to 10 years of broking experience in property insurance," and "3 or more years in a supervisory role." (Decl. of David Brooks in Supp. of Summ. J., ECF

3

No. 41 ("Brooks Decl."), Ex. A.) The parties dispute whether Jain was qualified for this role. Tokio Marine argues that Jain had insufficient "broking experience in property insurance" and supervisory experience, which Jain tacitly concedes. (Jain Aff. ¶ 73 (explaining that he had "one year" "broking experience" and "one year in a supervisory role").) Jain counters that the job description called for "[p]referably" five to ten years of broking experience, and he claims that he had "several years of training and managing junior underwriters at Axis USA," which constitutes sufficient supervisory experience, even if it was not technically in a "supervisory role." (Jain Aff. ¶ 73.) Jain also claims that after he expressed interest in the HOP position, no one at Tokio Marine informed him that he was unqualified. (Jain Aff. ¶ 72.)

In November 2014, Naganuma, Taylor, and a human resources representative interviewed Jain for the HOP position. (Pl.'s 56.1 ¶ 23.) While Tokio Marine claims Jain was rude and frustrated during the interview, Jain denies it. (Pl.'s 56.1 ¶ 24.) Tokio Marine contends that it chose Robert Crabb, a white male, who it claims was much more qualified than Jain to fill the HOP position. (Pl.'s 56.1 ¶ 25.) Jain argues that Crabb was not the person who got the HOP job, because Crabb only filled that role after another employee resigned. Specifically, Jain asserts that Tokio Marine offered the role of "Deputy Head of Property" to a white male who interviewed for the HOP position. (Pl.'s 56.1 ¶ 25.) Jain claims that he should have been offered the Deputy HOP position instead.[1] Jain further argues that Tokio Marine hired Crabb as HOP only after the Deputy HOP resigned in late 2015. (Pl.'s 56.1 ¶ 25.) Either way, Jain claims that Crabb was not more qualified than him, particularly due to Crabb's lack of underwriting experience. Indeed, Crabb's resume demonstrates no obvious underwriting experience, but it

---

[1] This argument is unpersuasive because the Deputy HOP position was not created until six months after Jain's termination, and it was filled by an employee in the Atlanta, Georgia office. (See Decl. of Raymond T. Mak, Esq. in Supp. of Summ. J., ECF No. 57, Ex. B.) As such, it warrants no further discussion.

4

also shows that he had significant supervisory and broking experience—areas in which Jain was less seasoned. (Brooks Decl. Ex. D.)

About a week after Jain's interview, Tokio Marine decided to eliminate the Senior Underwriter position at the New York office. (Pl.'s 56.1 ¶ 26.) Tokio Marine argues that this decision "was based upon purely business and economic reasons" and made to cut costs. (Pl.'s 56.1 ¶ 26.) According to a November 10, 2014 memorandum from Taylor to Naganuma, they recommended eliminating the Senior Underwriter position because "there is no practical difference in the outcomes produced by the Senior Underwriter and Underwriter positions." (Decl. of Jason Taylor in Supp. of Summ. J., ECF No. 44 ("Taylor Decl.") Ex. C at D000081.) That memorandum further noted that the New York unit was "small (only 6 employees in the current structure)," and thus did not need a "second in charge," and that two similar units outside the United States did not have a Senior Underwriter. (Taylor Decl. Ex. C at D0000081–82.) It also explained that there would be "significant" cost savings associated with eliminating the position, "given both the reduction in headcount and the salary and benefits package afforded to a Senior Underwriter." (Taylor Decl. Ex. C at D0000082.)

Jain counters that Tokio Marine fails to offer evidence of how eliminating the Senior Underwriter position would have saved money. Moreover, Jain disputes that the New York unit was in decline in 2014, arguing premiums had grown 17 percent from 2012 to 2013. However, Naganuma said that the 17 percent increase indicates "[n]othing in particular." (ECF No. 53, Naganuma Dep. Tr. at 60:21–61:12.) Moreover, those premium percentages do not relate to 2014, the year in question. And "Book Summaries" of the New York unit demonstrate that every underwriter in the New York unit suffered a declining "Account Load/Balance" from 2013 to 2014. (Jain Aff. Ex. 7.)

5

On November 19, 2014, Naganuma, Taylor, and a human resources representative informed Jain that he was not selected for the HOP position, the Senior Underwriter position was being eliminated, and he was being terminated. (Pl.'s 56.1 ¶ 27.) Jain contends that during that meeting Taylor told him that he was not "the right cultural fit" for Tokio Marine. (Pl.'s 56.1 ¶ 28; Jain Aff. ¶ 78.) It is unclear whether that comment related to the HOP or Senior Underwriter position. (Decl. of Raymond T. Mak, Esq. in Supp. of Summ. J., ECF No. 40 ("Mak Decl."), Ex. F at 228 ("Now, did Mr. Taylor respond by saying this with your not getting the HOP position, or because [the Senior Underwriter position] was eliminated . . . ? A. I'm not sure on what basis he responded.").) All three of the Tokio Marine employees who attended the meeting testified that Taylor did not make such a statement. (Pl.'s 56.1 ¶ 29.) In addition, in two earlier employment discrimination lawsuits against other companies, Jain claimed that those previous employers used similar "fit" language. (Mak Decl. Exs. D & E.)

Tokio Marine contends that the Senior Underwriter position was eliminated upon Jain's termination and that it was never filled. (Pl.'s 56.1 ¶ 32.) However, two Underwriters described themselves as "Senior Underwriters" on their LinkedIn pages after Jain's termination, and Jain contends that the current Assistant Vice President ("AVP") conducts duties which "are that of a senior underwriter in all but name." (Pl.'s 56.1 ¶ 32 Resp.; Jain Aff. ¶¶ 59–61; Jain Aff. Exs. 8–9.) However, the Senior Underwriter and AVP job descriptions demonstrate that the AVP role is more focused on growth strategy, business development, and supervision of underwriting, while the Senior Underwriter position is focused on actual underwriting. (Jain Aff. Exs. 12–13.) And several Tokio Marine employees testified that the Senior Underwriter position was never filled, and screenshots from Tokio Marine's human resources system show that the two employees who claimed to be Senior Underwriters on LinkedIn were listed as

"Underwriters."  (See, e.g., Decl. of Patti-Ann Fitzsimmons in Supp. of Summ. J., ECF No. 42 ("Fitzsimmons Decl.") ¶¶ 9–10 & Ex. B.)

DISCUSSION

I. Legal Standard

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted).  This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); Upadhyay v. Sethi, 848 F. Supp. 2d 439, 446 (S.D.N.Y. 2012) (denying summary judgment where court would have had to weigh the credibility of dueling affidavits).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ."  Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 249 (citation and quotation marks omitted).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted).  "In determining whether a genuine issue of material fact exists, a court

7

must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

Moreover, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quotation marks omitted). "[N]othing in the rules or the case law requires a court to strike any portion of . . . [a Rule 56] affidavit that is not properly supported. A court may decline to conduct a line-by-line analysis and instead simply disregard the allegations that are not properly supported." Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist., 2009 WL 1576467, at *8 (S.D.N.Y. June 2, 2009). As such, where the Court "has not relied upon any evidence submitted that is not supported or admissible," it need not "strike any portions of [either parties'] evidence." Mergers & Acquisition Servs., Inc. v. Eli Glob., LLC, 2017 WL 1157132, at *16 (S.D.N.Y. Mar. 27, 2017).

Finally, the Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (quotation marks omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts." Gorzynski, 596 F.3d at 101 (citation and quotation marks omitted).

II. Title VII Claims

"Title VII race discrimination and retaliation claims are subject to the McDonnell Douglas burden-shifting standard." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). Three stages comprise that framework. First, an employee must establish a prima facie

8

case of discrimination or retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Kirkland, 760 F.3d at 225. "The plaintiff's burden in this regard is de minimis, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory [or discriminatory] motive." Hicks, 593 F.3d at 164; Bucalo v. Shelter Island Union Free Sch. Dist., 591 F.3d 119, 128 ("The requirements to establish a prima facie case are minimal and a plaintiff's burden is therefore not onerous." (citations and quotation marks omitted)).

Once a prima facie case is established, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. Specifically, the employer must offer, "via admissible evidence, a justification of its action which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination or retaliation." Kirkland, 760 F.3d at 225. At that stage, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (ellipsis in original) (quotation marks omitted); Kirkland, 760 F.3d at 225 ("With respect to a retaliation claim, the employee's admissible evidence must show that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

Jain brings four claims under Title VII: (1) discriminatory failure to promote; (2) discriminatory termination; (3) retaliatory failure to promote; and (4) retaliatory termination.

"To state a prima facie case of race discrimination, a plaintiff must proffer evidence that (1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination." Kirkland, 760 F.3d at 225; Terry, 336 F.3d at 137–38. To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks, 593 F.3d at 164 (quotation marks omitted).

### A. Discriminatory Failure to Promote

Jain argues that Tokio Marine denied him the HOP promotion because of his race/national origin. Tokio Marine concedes that Jain was a member of a protected class and that it did not promote him. Therefore, at issue is whether Jain was qualified for the HOP position and whether the circumstances surrounding the failure to promote give rise to an inference of discrimination.

"In determining whether an employee is 'qualified' . . . a court must examine 'the criteria the employer has specified for the position." Gonzalez v. City of New York, 354 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) (quotation marks omitted). While Jain's qualifications do not fit the job description to a "T," a rational juror could find he was qualified. Tokio Marine argues that Jain lacked adequate experience, particularly in the areas of "broking" and supervisory roles. But the job description called for "[p]referably" five-to-ten years' broking experience—it did not require it. (Brooks Decl. Ex. A (emphasis added).) Though Jain possessed only one year of broking experience, this Court cannot say as a matter of law that this disqualifies him for the HOP position, especially given his extensive underwriting experience.

Indeed, Tokio Marine hired Crabb as HOP, and his resume reveals no underwriting experience. (Brooks Decl. Ex. D.) In addition, Jain had "several years of training and managing junior underwriters at Axis USA." (Jain Aff. ¶ 73.)

Courts have found an inference of discrimination where the applied-for position was filled by someone not a member of plaintiff's protected class, which is the case here. See de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996) (explaining that an inference of discrimination may arise where the position was filled by someone not a member of plaintiff's protected class); Morris v. Ales Grp. USA, Inc., 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007) (same); Mason v. N.Y.C. Transit Auth., 2005 WL 1354032, at *5 (S.D.N.Y. June 7, 2005) (same); Mitchell v. N. Westchester Hosp., 171 F. Supp. 2d 274, 278 (S.D.N.Y. 2001) (same); Gomez v. Pellicone, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (same).

Because Jain states a prima facie case, the burden shifts to Tokio Marine to articulate some non-discriminatory motive for not promoting Jain. McDonnell Douglas, 411 U.S. at 802. Tokio Marine offers evidence that Jain interviewed poorly for the position and lacked preferred qualifications in broking and supervisory roles. (See Brooks Decl. ¶ 3; Fitzsimmons Decl. ¶¶ 7–8; Decl. of Satoshi Naganuma in Supp. of Summ. J., ECF No. 43 ¶¶ 5–6; Taylor Decl. ¶¶ 9–10.) Although this Court cannot decide as a matter of law that Jain was not qualified, he was certainly inexperienced in areas where Tokio Marine preferred experience. Together with testimony regarding Jain's interview, such evidence, "if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination." Byrnie, 243 F.3d at 102 (holding that employer articulated a legitimate reason for not hiring plaintiff where another candidate "performed better than [plaintiff] during the candidate interview and thus seemed,

11

based on subjective criteria, the better qualified candidate"). Indeed, one of the cases Jain cites, Mandell v. County of Suffolk, held that an employer's "negative impression [of] plaintiff made on him during" an interview established a sufficient non-discriminatory reason for not promoting him. 316 F.3d 368, 380–81 (2d Cir. 2003). In addition, Crabb—the eventual HOP—had substantial supervisory experience. (See Brooks Decl. Ex. D.)

However, there is a material dispute of fact with respect to whether these reasons were pretextual. As a threshold issue, Tokio Marine's reliance on Byrnie is misguided. Specifically, Tokio Marine argues that, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Byrnie, 243 F.3d at 103 (quotation marks omitted). But the Byrnie standard does not apply where "a case [is] about more than mere 'discrepancy in qualifications.'" Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 253–54 (2d Cir. 2014); Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 78 (2d Cir. 2016) (same).

In Abrams, a New York City detective was denied a promotion to an elite position with a group within the Department of Public Safety ("DPS") known as the "Van." Abrams, 764 F.3d at 247–48. DPS claimed that Abrams was not selected for the Van because of poor performance evaluations and the lack of a college degree. Abrams, 764 F.3d at 248. However, after DPS rejected Abrams for the position multiple times, DPS explained that another applicant was a "better fit" than Abrams and that Abrams did not "fit in." Abrams, 764 F.3d at 248. A supervisor who recommended Abrams for the position stated in his deposition that it "crossed his mind" that the "better fit" comment "could relate to race." Abrams, 764 F.3d at 248. In view of

12

these comments, the Second Circuit explained that the District Court erred in applying Byrnie and granting summary judgment for defendants because "Abrams's non-assignment to the Van as well as the [f]it [i]n [s]tatements make this case about more than mere 'discrepancy in qualifications as was the case in Byrnie." Abrams, 764 F.3d at 254. Thus, the Second Circuit held that "the phrasing 'better fit' or 'fitting in' just might have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury. It is enough of an ambiguity to create a reasonable question of fact." Abrams, 764 F.3d at 253.

Accordingly, Jain need not show that he was the far superior candidate, and evidence regarding "discrepancy [in qualifications] is [not] stripped of all probative value" where there is other evidence of discriminatory intent. Byrnie, 243 F.3d at 103. Indeed, "[a]t summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie, 243 F.3d at 102; see Walsh, 828 F.3d at 76 (explaining that courts must view a plaintiff's evidence at the pretext stage "as a whole rather than in piecemeal fashion").

Jain's testimony attributing the statement that he was not the "right cultural fit" at Tokio Marine to Taylor seems entirely opportunistic and custom tailored to the Second Circuit's holding in Abrams. And the fact that he used similar phrases in two prior employment discrimination lawsuits raises additional warning signs in this Court's mind. But while all other individuals who were present at the meeting deny that Taylor or anyone else made such a statement, this Court cannot "[r]esolv[e] these differing versions of the events into a coherent whole," Upadhay, 848 F. Supp. 2d at 446, because it may not "weigh the evidence and determine

13

the truth of the matter," Cioffi, 444 F.3d at 162. If Jain proceeds to trial, this will undoubtedly be fertile ground for cross examination.

Ultimately, even though it is just one remark, under Jain's theory, it was the basis for Tokio Marine's decision not to promote him. In view of Abrams's holding that "even when isolated, [cultural fit comments] could be enough to create a reasonable question of fact for a jury," this dispute should go to trial. Abrams, 764 F.3d at 253.[2]

### B. Discriminatory Termination

Jain also claims that Tokio Marine terminated him because of his race/national origin. "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996). To defeat summary judgment, Jain "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Walsh, 828 F.3d at 78 (quotation marks omitted). Here again, Jain presents a material issue of fact with respect to whether Tokio Marine's proffered non-discriminatory reasons for his termination were pretextual.

First, Jain demonstrates that his treatment changed after Taylor took over. See McDonnell Douglas, 411 U.S. at 805 (holding that evidence of pretext can include facts related

---

[2] Tokio Marine's argument on reply that Taylor was not a "decisionmaker" is unpersuasive, given that Taylor was tasked "to identify a replacement" HOP. (Pl.'s 56.1 ¶ 6.) In addition, to determine "whether a [discriminatory] remark is probative, [courts] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010). Here, all four factors favor Jain: (1) Taylor was Jain's interim supervisor and was tasked with finding a new HOP; (2) the remark was allegedly made during the meeting in which Jain was told he would not be promoted; (3) the remark can be viewed as discriminatory; and (4) the remark was made in relation to a decision making process.

to employee's treatment by employer). As discussed above, Jain received satisfactory reviews from Taylor's predecessor, and problems with Jain seemed to arise only after Taylor took over. Second, and coinciding with the fact that his alleged mistreatment occurred upon Taylor's arrival, Taylor is alleged to have told Jain—the only person of Indian descent in his group—that he was terminated because he was not the "right cultural fit." See Abrams, 764 F.3d at 253; Henry, 616 F.3d at 149. Therefore, the discriminatory termination also should proceed to trial.

    C. Retaliation

Jain argues that Tokio Marine failed to promote him and terminated him in retaliation for his complaints about harassment. Tokio Marine argues that Jain did not participate in a protected activity, Tokio Marine did not know of the protected activity, and there was no causal connection between any protected activity and the adverse employment actions. Because these two claims overlap in every way aside from the adverse employment actions—which are not disputed here—they can be discussed concurrently. Although this standard is "not onerous," Jain fails to establish a prima facie case. Bucalo, 591 F.3d at 128.

Title VII "makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." Littlejohn v. City of New York, 795 F.3d 297, 316 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)). Accordingly, "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 682 (S.D.N.Y. 2012) (quotation marks omitted). Indeed, included within Title VII's anti-retaliation protections are "informal protests of discriminatory employment practices,

15

including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). In addition, "[a] plaintiff need not prove the merit of [the] underlying discrimination complaint to state a retaliation claim, but only that [he] was acting under a good faith, reasonable belief that a violation existed." Bliss v. MXK Rest. Corp., 220 F. Supp. 3d 419, 425 (S.D.N.Y. 2016) (first alteration in original) (quotation marks omitted).

"As to the second element [of the prima facie case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 15 (2d Cir. 2013) (quotation marks omitted) (alteration in original). "While there are no magic words that must be used when complaining about a supervisor," Ramos v. City of New York, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997), "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally," Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010). Therefore, "[w]hen the conduct complained of . . . does not lend itself to a reasonable inference of unlawful discrimination, such 'magic words' may be the only way to put the employer on notice that the employee believes himself to be complaining of discriminatory conduct." Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 521–22 (S.D.N.Y. 2010).

Jain concedes that "he never mentioned or used the word 'discrimination'" and "that he never mentioned that he was being treated differently because of his national origin or

16

race" to anyone at Tokio Marine. (Pl.'s 56.1 ¶¶ 18, 20; Jain Aff. ¶ 67.) Rather, he claims his complaints implied racial discrimination because Tokio Marine "knew [his] race and national origin," (Pl.'s 56.1 ¶ 20), and "the race and color of [his] peers," (Jain Aff. ¶ 67). These concessions prove fatal to his claims. See Forest v. N.Y. State Office of Mental Health, 2015 WL 6965149, at *7 (S.D.N.Y. Nov. 10, 2015) (holding that a union grievance that made no mention of discrimination was not a protected activity); Sharpe, 684 F. Supp. 2d at 406–07 (granting summary judgment because employee never mentioned that supervisor's mistreatment of him was connected to race); Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (holding there was no knowledge of a protected activity, even where a female high-level manager complained about having to perform secretarial work and where manager commented that "being the world's highest paid secretary is nothing to be proud of"); Soliman v. Deutsche Bank AG, 2004 WL 1124689, at *13 (S.D.N.Y. May 20, 2004) ("[W]here a plaintiff's complaint is vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity.").

Jain merely complained of "harassment" and instances in which Taylor treated him poorly. He made no mention to Tokio Marine that he viewed Taylor's actions as racially discriminatory, and nothing on the face of his complaints—or the actions giving rise to those complaints—demonstrates racial animus. In Sharpe, a judge in this District granted summary judgment for an employer where a supervisor "berated and belittled [the employee] on a weekly or bi-weekly basis," because, even though the employee complained about his supervisor's yelling at him and a "heated argument [with his supervisor] . . . which was broken up by a co-worker," the employee never included in his complaints that the supervisor's behavior was connected to race. Sharpe, 684 F. Supp. 2d at 406–07. At best, Jain complained of unfair

17

treatment. "Unfair treatment, however, is not actionable under the civil rights laws and a complaint about it does not constitute protected activity. To be actionable, the unfair treatment must be due to one's membership in a protected class and the complaint must make that point sufficiently clear." Ramos, 1997 WL 410493, at *3. Such an interpretation is buttressed by Naganuma's response to Jain's complaint, in which he said he was "perplexed about [Jain's] comment." (Pl.'s 56.1 ¶ 19.)

In addition, a Second Circuit panel expressly rejected Jain's argument that "implicit" complaints are sufficient. See McDowell v. T-Mobile USA, Inc., 307 F. App'x 531, 534 (2d Cir. 2009) (summary order). In McDowell, an employee "never explicitly complained about racial discrimination in any of his oral complaints" to his employer, but argued that he "implicitly" complained about race. McDowell, 307 F. App'x at 534. Because "there [wa]s no evidence in the record . . . on which a jury could conclude that plaintiff's supervisors could have understood that plaintiff's complaints about a paperwork delay and a co-worker's career were about race," the employee failed to establish a prima facie case. McDowell, 307 F. App'x at 534. Accordingly, "given the [race]-neutral conduct [Jain] actually complained of, . . . there was nothing in [his] protests that could reasonably have led [Tokio Marine] to understand that [race] was the nature of [his] objections." Krasner, 680 F. Supp. 2d at 521–22. Therefore, Jain's claims for retaliation are dismissed.

III. NYCHRL Claims

"Pursuant to [New York City Council] revisions [to the NYCHRL], courts must analyze NYCHRL claims separately and independently from any federal and state law claims . . . ." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citations and quotation marks omitted). Accordingly, this Court must construe the

18

NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Albunio v. City of New York, 947 N.E.2d 135, 137 (N.Y. 2011). Simply put, "[t]he Restoration Act recognizes federal and state civil rights provisions as a floor below which the [NYCHRL] law cannot fall." Melman v. Montefiore Med. Ctr., 946 N.Y.S.2d 27, 30, 45 n.2 (N.Y. App. Div. 2012). However, "summary judgment is still appropriate in NYCHRL cases, but only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." Mihalik, 715 F.3d at 113.

Since Jain's discrimination claims survive summary judgment under Title VII, they also survive under the NYCHRL. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) ("[T]o the extent that the defendant has failed to show it is entitled to summary judgment under McDonnell Douglas, it would not be entitled to summary judgment under the more expansive standard of the NYCHRL."). Therefore, the remaining question is whether the retaliation claims survive under a less strict NYCHRL analysis.

Even under the NYCHRL, a plaintiff still must establish a prima facie case. See Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75–76 (2d Cir. 2015) ("New York courts seeking to heed the City Council's command have approached discrimination and retaliation claims under a similar framework. In both situations, the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions." (emphasis added)). However, the "NYCHRL's retaliation provision is broader than Title VII's—protecting plaintiffs who oppos[e] any practice forbidden under the law from conduct reasonably likely to deter a person engaging in such action." Ya-Chen, 805 F.3d at 76 (quotations omitted) (alteration in original). Still, "to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that []he took an action opposing [his] employer's

19

discrimination . . . ." Mihalik, 715 F.3d at 112; Albunio, 947 N.E.2d at 138 (retaliation plaintiff "can prevail only if she shows that she 'opposed' discrimination").

For the same reasons described earlier, Jain does not carry his burden here. See Garcia v. Comprehensive Ctr., LLC, 2018 WL 3918180, at *4 (S.D.N.Y. Aug. 16, 2018) (holding that a plaintiff's NYCHRL claim failed with her state and federal claims because, "even though NYCHRL claims are generally construed more liberally," she "failed to allege that she engaged in any protected activity"); Adams v. Montefiore Med. Ctr., 2017 WL 4417695, at *5 (S.D.N.Y. Oct. 3, 2017) ("[A] plaintiff still must establish that there was a causal connection between his protected activity and the employer's subsequent action . . . ."); Pouncy v. Advanced Focus LLC, 2017 WL 4280949, at *6 (S.D.N.Y. Sept. 25, 2017) (explaining that "[t]he elements of a prima facie case of retaliation under the NYCHRL are identical [to Title VII's], except that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity" and dismissing employee's claim for failure to show he engaged in protected activity) (quotation marks omitted)). Therefore, Jain's retaliation claims under the NYCHRL are dismissed.

## CONCLUSION

For the foregoing reasons, Tokio Marine's motion for summary judgment is granted in part and denied in part. Jain's claims for retaliation under Title VII and the NYCHRL are dismissed. Tokio Marine's motion is denied in all other respects. The parties are directed to appear for a status conference on October 23, 2018 at 10:00 a.m. The Clerk of Court is directed to terminate the motion pending at ECF No. 39.

Dated: September 27, 2018
      New York, New York

SO ORDERED:

20

_____
WILLIAM H. PAULEY III
U.S.D.J.